IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MARYLAND

| UNITED STATES | : | |
| --- | --- | --- |
| | : | |
| v. | : | Case No. ELH-20-361 |
| | : | |
| JAMES PICCIRILLI | : | |
| | : | |
| Defendant | : | |

Comes now, Mr. James Piccirilli, through undersigned counsel, and provides the Honorable Court with the following memorandum in anticipation of Mr. Piccirilli's November 19, 2021 sentencing. The parties have presented the Court with a plea agreement pursuant to Rule 11(c)(1)(C), which provides for a sentence between 30 and 46 months. For the reasons provided below, a sentence of 30 months, which statute mandates must run consecutively to Mr. Piccirilli's previous sentence of 30 months in case 19-60-SDT, is the sentence that is "sufficient, but not greater than necessary" under the factors listed at 18 U.S.C. § 3553(a). In support of this position, Mr. Piccirilli state as follows:

**SENTENCING MEMORANDUM**

I. **Mr. Piccirilli's History and Characteristics**

For the vast majority of Mr. Piccirilli's 40 years on this earth, he has been an admirable example of kindness, public service, and adherence to the law. Mr. Piccirilli is beloved by friends and family who know him as kind, caring, and technologically gifted. Until the winter of 2018, Mr. Piccirilli had no criminal history, and in fact had proudly served as a law enforcement officer with the Brunswick Police Department from 2009 to 2016.

Those who know Mr. Piccirilli best speak of his reflexive desire to help others in need. Mr. Piccirilli's mother and father recall that as a police officer he went out of his way to get help to

1

addicted people and victims of domestic violence. Exhibit 1 (letter from Mr. Piccirilli's mother and father); *see also* Exhibit 2 (letter from friend Ryan Codd sharing that Mr. Piccirilli helped him through a time of addiction); Exhibit 3 (letter from friend and coworker Brooklyn Salisbury). Jackie Piper, Mr. Piccirilli's sister, portrays him as a constant source of emotional and logistical support. Exhibit 4 (letter from Jackie Piper). And Mr. Piccirilli's sick and elderly grandmother remembers him caring for her while he was released on home confinement in the underlying case. Exhibit 5 (letter from Mr. Piccirilli's grandmother).

Mr. Piccirilli deeply loves his two children. He cherishes the support of his family and friends. He will have a robust network of support when he returns home.



*Figure 1: Mr. Piccirilli (Center, in the Tan T-Shirt) with Family in 2017*

Mr. Piccirilli found his calling in life working with complex machines. Family members relate that, due to a diagnosis of ADHD, Mr. Piccirilli struggled to achieve success in school at a young age. Exhibit 1; *see also* Exhibit 6 (school paperwork from Mr. Piccirilli's childhood documenting ADHD diagnosis).[1] In spite of these early difficulties, Mr. Piccirilli went on to earn his GED and take extensive college classes at Carroll Community College. ECF No. 65 ¶ 62. For Mr. Piccirilli, technology has always been a fascination. He took quickly to understanding and eventually building complex machines. Mr. Piccirilli's sister recalls that his interest shifted from cars, to trains, then finally firearms—a turn she always has seen as "ironic" because she knows Mr. Piccirilli's nonviolent and "pacifist" nature. Exhibit 3. Accordingly, far from being a "gun nut" who habitually stockpiles illegal weapons, Mr. Piccirilli spent years legitimately working at various firearms engineering firms both during and after his time as a police officer. ECF No. 65 ¶ 66.

At bottom, though, Mr. Piccirilli's focus on mechanical engineering was driven by his desire to use his technological gifts to help others. Mr. Piccirilli hoped to make firearms that would save the lives of American military and law enforcement officers. Mr. Piccirilli's friend, Ryan Codd, writes that Mr. Piccirilli saw these technical contributions as a way to serve his county when he himself could not join the military because of eyesight issues. Exhibit 2.

---

[1] This exhibit is submitted with apologies for its old and damaged quality.



*Figure 2 and 3: Mr. Piccirilli with His Daughter and Son*

## II. The Nature and Circumstance of the Offense

Mr. Piccirilli has fully taken responsibility for the offense at issue in this case, and does not attempt to diminish its seriousness. That said, it is important to understand that Mr. Piccirilli's flight and failure to self-surrender do not show that he is beyond redemption or that he is a danger to the community. Rather, these regrettable decisions reflect an aberrational lapse in judgment during a period of hopelessness and despair.

*1. Mr. Piccirilli's Underlying Conviction and Sentencing*

The PSR summarizes the facts and procedural history of Mr. Piccirilli's first criminal conviction and sentencing before Judge Stephanie Thacker in case number 19-60-SDT. The basic allegations in the case were that Mr. Piccirilli sold a federally regulated weapon (machine gun, as it is known colloquially) through an intermediary, and possessed several more federally regulated firearms without a license. *See generally* ECF No. 65 ¶ 36; Exhibit 7 (sentencing transcript). Mr. Piccirilli eventually pled guilty to one count of possessing an unregistered firearm in violation of

26 U.S.C. § 5845(a), a strict liability offense that criminalizes possession of unregistered federally regulated weapons.

By no means does Mr. Piccirilli wish to re-litigate his guilt in case 19-60-SDT during his sentencing in this case. Mr. Piccirilli pled guilty, and Judge Thacker found that he had accepted responsibility for the purposes of the guidelines calculation. Exhibit 7 at 34. However, to understand Mr. Piccirilli's mental state at the time of his flight, it is important to note that there were aspects of the government case with which Mr. Piccirilli disagreed.

To pick a conspicuous example, Mr. Piccirilli has sometimes dwelled on a dispute from his first case regarding his mistaken belief that he remained on a federal firearms license ("FFL") at the time of his arrest. For a time, Mr. Piccirilli was allowed to possess certain machine guns because he was on the FFL of his former employer, FJB Engineering. After a falling out with FJB, the firm removed Mr. Piccirilli from the license without telling him. Yet, a friend of Mr. Piccirilli's who still worked at FJB assured him repeatedly that he was still covered by the FFL and thus was able to continue to possess these firearms. This same friend spoke of these exchanges at Mr. Piccirilli's first sentencing. *See* Exhibit 7 at 52–54. Because of misunderstandings like this one, Mr. Piccirilli has sometimes harbored the belief that former friends and coworkers exaggerated the illegality of his conduct to the government, either because of personal grievances or to profit on technological innovations of Mr. Piccirilli's. [2] Disagreements like this one made it particularly difficult for Mr. Piccirilli to cope with his first ever criminal prosecution.

---

[2] Again, Mr. Piccirilli does not air this past dispute because he wishes to re-litigate its merits. If asked, the government would likely retort that Mr. Piccirilli's belief that he was present on the FFL did not render his possession of the machine guns legal because these guns were unregistered. *See* 19-60-SDT, Dkt. No. 66 at 3 (government making this argument regarding registration in its sentencing memo in the initial case). Rather, it is Mr. Piccirilli's way of experiencing and understanding this dispute that bears on his culpability in this case.

Around the same time Mr. Piccirilli was indicted, he was also struggling with a divorce which was initiated in August of 2018. To call this divorce acrimonious is an understatement. Mr. Piccirilli and his ex-wife fought bitterly over every aspect of the dissolution of the marriage. Scars from this split can still be seen in Mr. Piccirilli's family's statements regarding his ex-wife. ECF No. 65 ¶ 51.

On January 13, 2020, Judge Thacker sentenced Mr. Piccirilli to 30 months' imprisonment following his plea of guilty. Mr. Piccirilli, who was on pretrial supervision, was ordered to self-surrender by March 16, 2020. By this time, he had lost custody of his children to his ex-wife. He knew his conviction rendered him a felon and disqualified him from continuing his career in the U.S. firearms industry. At the close of Mr. Piccirilli's sentencing he apologized to Judge Thacker for breaking the law and lamented that his past life was in many respects no more: "It's my life, it's gone now . . . everything that I had and everything, it's gone." Exhibit 7 at 64.

2. *Mr. Piccirilli's Decision to Flee*

It is difficult to overstate Mr. Piccirilli's overwhelming feelings of hopelessness in January of 2020. Mr. Piccirilli felt that life as he knew it had come crashing down around his ears. Mr. Piccirilli had spent years applying his technical expertise in the firearms industry and felt that he was close to breakthroughs in technology. Now, because of his felony conviction, he would never work in the industry again. Mr. Piccirilli was also known by all to be a loving father to his children. Now, because of a bitter divorce and his federal criminal case, he had lost custody of his children for the foreseeable future. And worst of all, Mr. Piccirilli had learned through friends and his family law attorney that his ex-wife had leveled the false claim against him that he had sexually abused his own children (a fabricated accusation on which he was never arrested, charged or even interviewed).

6

Thus, as he neared his 39th birthday, Mr. Piccirilli sat at home awaiting his federal prison sentence. He was at a loss for what he would do when released. He speculated constantly as to whether would be indicted on baseless but horrifying criminal charges of child sexual abuse. Mr. Piccirilli's sister recalls that around this time his "mental state slowly deteriorated" because he was unable to sleep from the stress. Exhibit 4 (letter from Jackie Piper); *see also* Exhibit 3.

Approximately a week after Mr. Piccirilli's sentencing, he received a call from an anonymous number. The caller, whose voice was electronically distorted and impossible for Mr. Piccirilli to place, threatened to harm Mr. Piccirilli and his girlfriend (and now co-defendant) Kelli Warfield. Given the bitter divorce, Mr. Piccirilli speculated that his ex-wife might be responsible. In any event, the call was deeply frightening to both Mr. Piccirilli and his family.

With the benefit of twenty-twenty hindsight, it is easy to view this call as a minor thing— a morbid crank call that at most merited contacting the police. But for Mr. Piccirilli it served as the straw that broke the camel's back. Mr. Piccirilli feared for his and his loved ones' safety. In his place of hopelessness and believing that he had little to lose, Mr. Piccirilli rashly elected to disable his ankle monitor and flee the jurisdiction. Ms. Warfield elected to come with him.

3. *Mr. Piccirilli's Failure to Self-Surrender*

Mr. Piccirilli's flight was never supposed to be permanent. Based on conversations with pretrial officers, Mr. Piccirilli believed that pretrial supervisees often abscond from supervision and then nevertheless self-surrender as ordered by the sentencing Court. It was Mr. Piccirilli's intent to report to a federal facility and turn himself in on March 16, 2020 as he was ordered. Mr. Piccirilli does not defend this course of action as appropriate, but it was nonetheless his intention to comply with the Court's sentencing order.

Obviously this did not come to pass. By the time Mr. Piccirilli was preparing to make the trip to a federal facility to turn himself in, COVID-19 had begun to sweep across the United States.

7

Little was known about the virus besides that it spread aggressively in close quarters and could be deadly. Officials were bracing for COVID-19 to spread through prisons and jails in particular, a concern that was prompted by the grim impact that the virus had already had in many American nursing homes.

Mr. Piccirilli knew that the virus did not override the Court's order to turn himself in. But still, he was afraid. Like most of the country in March 2020, Mr. Piccirilli could see governments declaring states of emergency and lockdowns, and heard reports of emergency rooms beginning to fill. He knew his asthma put him especially at risk for a severe case of COVID-19. And so Mr. Piccirilli let March 16, 2020 come and pass without surrendering.

Mr. Piccirilli's time in law enforcement made it obvious to him that it was only a matter of time before he was apprehended. Mr. Piccirilli and Ms. Warfield had few resources and little support. Inevitably, the federal authorities would catch up to him; or perhaps a local police officer would happen to run his name and he would be arrested on an outstanding warrant. There was no long term plan to escape apprehension.

4. *Mr. Piccirilli's Arrest and Possession of Weapons*

As the Court knows from the PSR and the plea agreement, Mr. Piccirilli was arrested on October 13, 2020 in southern Indiana. He was cooperative and non-resistant with the agents who apprehended him. He admitted who he was and told the agents, when asked, that there was a rifle in the camper where he was living.

Mr. Piccirilli has taken full responsibility in his guilty plea for possessing the guns with which he was arrested. As a result, Mr. Piccirilli's guidelines are quite a bit higher than they would have otherwise been for failing to self-surrender. ECF No. 56 ¶¶ 33 (PSR reflecting offense calculated under § USSG 2K2.1 instead of § 2J1.6); *compare* USSG § 2J1.6(a)(1), (b)(2)(B)

(establishing an offense level 11 for Mr. Piccirilli's case, which would produce a guidelines range of 8–14 months with acceptance of responsibility).

It is important, however, to understand Mr. Piccirilli's purpose in possessing these weapons. It was never his intent to act offensively against others or to violently resist his arrest. Rather, Mr. Piccirilli armed himself because he was scared for his safety and knew that he was unable to go to the police for protection without being taken into custody.

Those who know Mr. Piccirilli best vouch for his peaceful and kindhearted nature, and that it would never have been his intent to hurt anyone with weapons expect, if absolutely necessary, in self-defense. As already mentioned, Mr. Piccirilli's sister always found his work with firearms to be "ironic" because of his non-violent nature. Exhibit 4 (Jackie's letter). Other loved ones echo similar sentiments. Exhibit 8 (Letter from friend Jordan Soliday stating that Mr. Piccirilli "doesn't have a mean bone in his body"). This gentle disposition even caused Mr. Piccirilli to struggle with the rougher sides of police work. David Lewis, a police officer and former colleague of Mr. Piccirilli's, spoke at the first sentencing. Mr. Lewis related that while Mr. Piccirilli excelled as a police officer in some respects—for instance, in working with victims and cooperative witnesses— he was too "nice" to show authority and "take control" of uncooperative suspects. Exhibit 7 at 50– 51. Others close to Mr. Piccirilli share this recollection of his time as a police officer. Exhibit 1 (letter from Mr. Piccirilli's mother and father explaining that Mr. Piccirilli gravitated towards "the community side of policing").

Mr. Piccirilli's criminal record underscores his utter lack of violent behavior. His only criminal history is the present case before the Court and the firearms conviction in case 19-60-SDT. He has no skeletons in his closet or *nolle prossed* assaults in his past. Thus, while Mr. Piccirilli's decision to arm himself while on the run surely represents a major lapse in judgment,

it does not show that the Court needs to impose a stiffer sentence to deter Mr. Piccirilli from violence or protect the community.

### III. Mr. Piccirilli's Presentence Incarceration During COVID-19.

Because of the timing of Mr. Piccirilli's arrest, the entirety of his year long period of presentence incarceration has occurred during the COVID-19 pandemic. The pandemic has made incarceration at the Chesapeake Detention Facility ("CDF") extraordinarily difficult. The outsized hardship Mr. Piccirilli has endured—and will likely continue to endure in the BOP—warrants a lower sentence than the Court would otherwise impose.

Beginning in early January 2020, CDF experienced a massive COVID-19 outbreak. On February 3, 2021, the Baltimore Sun reported that 132 detainees at CDF—about one-third of the incarcerated population there—had tested positive for the virus in the last month. Tim Prudente & Phillip Jackson, *Outbreak of COVID-19 at Baltimore Federal Jail Prompts Lockdown Even as Feds Prepare to Resume Grand Jury Proceedings*, Balt. Sun (Feb. 3, 2021), *available at* https://www.baltimoresun.com/news/crime/bs-md-ci-cr-federal-prison-coronavirus-20210203-trvhsshvtzgdvhj52l7dc5yn2a-story.html. To date, the Maryland Department of Public Safety and Correctional Services reports that CDF has weathered 194 positive cases among inmates and 100 cases among staff. *COVID-19 Dashboard*, Md. Dep't of Safety and Corr. Servs. (last visited Nov. 5, 2021), https://dpscs.maryland.gov/covid-19/.

The particulars of the outbreak conditions are disquieting. CDF's primary response to the outbreak was seemingly to severely restrict movement within the facility, imposing lockdowns for weeks at a time. Multiple clients of the Office of the Federal Public Defender reported during this time that detainees were locked down 23 hours a day or more. They were often unable to speak with their families or attorneys for lengthy stretches. They also had no access to basic personal hygiene products like soap, which are all the more essential during a COVID-19 outbreak. *Catchings v. Wilson et al.*,

10

21-cv-428-TSE, Dkt. No. 1, ¶¶ 129–33 (complaint of class action suit detailing conditions at CDF). Mr. Piccirilli recalls that during two stretches this winter, he was locked down in his cell for three days and not allowed to even shower. CDF staff suggested that he use water from the toilet to keep clean.

Thankfully, new positive cases at CDF have now abated. However, there is good reason to believe that difficult conditions will continue when Mr. Piccirilli arrives at the BOP. More than 42,000 BOP inmates have tested positive for COVID-19 throughout the pandemic. *COVID-19* Coronavirus, Federal Bureau of Prisons (last visited Nov. 5, 2021), https://www.bop.gov/coronavirus/#. The active COVID-19 cases in the BOP have waned of late, *id.* (documenting 133 current positive cases), but the BOP is still employing COVID-19 prevention measures that makes life difficult for inmates. The BOP's website lists the degree of "modified operation" for 98 of its 122 prisons.[3] *Id.* 31 of these facilities are employing "moderate modifications" to their operations; 59 are employing "intense modifications." *Id.* As best counsel can tell, facilities with "intense modifications" are still following the procedures the BOP used during the height of the pandemic. *See BOP COVID-19 Operational Levels*, Federal Bureau of Prisons (last visited Nov. 5, 2021), https://www.bop.gov/coronavirus/covid19_modified_operations_guide.jsp (advising that the BOP will "follow the COVID-19 pandemic plan" in facilities with "intense" modifications). This means that Mr. Piccirilli will, in all likelihood, continue to endure lockdowns, lack of programming, and sparse contact with his family.

Looking to conditions like the those at CDF and in the BOP, judges in this District and elsewhere have found the harshness of confinement during the COVID-19 pandemic to be a basis for granting a downward variance at sentencing, for imposing the defense's requested sentence, or for granting compassionate release and reducing a defendant's sentence. *See, e.g.*, *United States v. Jackson*, no. TDC-18-548 (D. Md. May 10, 2021) (identifying harsh conditions of pretrial

---

[3] The status of the remaining 24 facilities is unclear.

confinement due to pandemic as a basis for downward variance); *United States v. Thompson*, no. GLR-19-074 (D. Md. July 9, 2020) (same); *United States v. Allaire*, JKB-19-336, ECF No. 52 (D. Md. July 16, 2020) (making specific findings about the risk and threat of COVID and reducing defendant's sentence from what would have otherwise been imposed); *United States v. Cheese*, no. ELH-98-259, ECF No. 927 (D. Md. Feb. 9, 2021) (granting compassionate release and noting that the defendant's incarceration during the pandemic had increased the severity of his sentence past what was originally envisioned). As Judge Chuang noted in a compassionate release case early in the pandemic, such condition "increase[] the severity of the sentence beyond what" is usually anticipated. *United States v. Mel*, No. CR TDC-18-0571, 2020 WL 2041674, at *3 (D. Md. Apr. 28, 2020).

In this case, Mr. Piccirilli has served more than a year in custody in anomalously harsh pretrial conditions. Undeniably, these conditions have increased the severity of Mr. Piccirilli's time in custody. He has had to adjust to his first and only bout of incarceration during rolling lockdown, with little contact with his family, and through constant fear for his own safety. And although Mr. Piccirilli looks forward to having access to education, work, and programming in the BOP, COVID-19 restrictions may still make these pursuits difficult. Much like in the above cases, the conditions Mr. Piccirilli has faced underscore the appropriate nature of a lesser term of punishment.

### IV. The Sentencing Guidelines

Mr. Piccirilli's guidelines in this case are 37-46 months, with an offense level 19 and a criminal history category of III. *See* ECF No. 65 ¶¶ 33, 39, 73. As alluded to above, these guidelines are higher than they normally would be because the parties have agreed to use USSG § 2K2.1 to calculate Mr. Piccirilli's offense level given Mr. Piccirilli's possession of weapons. Probation

recommended that Mr. Piccirilli receive a guidelines sentence of 37 months, the bottom of the guideline range. *Id.* at 17. However, a peculiar interplay between the guidelines and statute of conviction in this case has caused Mr. Piccrilli's guideline range to overshadow his culpability and recommend an unduly harsh result.

Mr. Piccirilli was indicted and pled guilty to one count of failure to surrender for service of a sentence under 18 U.S.C. § 3146(a)(2), which carries a maximum sentence of five years. Any sentence imposed under § 3146(a)(2) must run consecutively to the sentence for the underlying offense. *See* § 3146(b)(2). Thus, this Court is statutorily bound to impose Mr. Piccirilli's sentence in this case consecutively to Mr. Piccirilli's 30-month sentence in 19-60-SDT.

Normally, the guideline provision that applies in § 3146 cases is USSG § 2J1.6. The offense levels prescribed under § 2J1.6 are objectively quite low. When a defendant fails to surrender for a sentence, the maximum offense level is 11. *See* § 2J1.6(a)(1). When a defendant fails to appear for a court appearance, the maximum offense level is 15. *See* § 2J1.6(a)(2), (b)(2)(A) (offense level 15 when a defendant is charged with an offense that carries a maximum sentence of life imprisonment or death). These relatively lenient offense levels undoubtedly factor in the consecutive nature of convictions under § 3146 and seek to avoid an unduly harsh, mandatorily consecutive guideline range.

Here, though, Mr. Piccirilli must face a longer guideline range that does not have the guardrails that the Sentencing Commission put in place to prevent a lengthy, mandatorily consecutive sentence. Mr. Piccirilli does not receive the benefit of § 2J1.6's lower offense levels because the parties have stipulated to the application of § 2K2.1. Thus, his guidelines are both lengthy and his sentence must be consecutive, creating a guideline range that suggests an unusually severe total sentence in this case.

The government might respond that the length of the guidelines in this case is simply the natural result of Mr. Piccirilli's possession of firearms. Indeed, the government has told counsel during plea negotiations that its decision to extend a plea offer with guidelines under § 2K2.1 stemmed from the fact that United States Attorney's Office in the Southern District of Indiana had elected not to prosecute Mr. Piccirilli under 18 U.S.C. § 922(g).[4] Yet, this does not fully account for the guideline range in this case. Had Mr. Piccirilli been charged separately in the Southern District of Indiana, Mr. Piccirilli might have advocated for a sentence under § 922(g) that is concurrent to that in 19-60-SDT. In point of fact, the sentencing guidelines contemplate that courts might reasonably grant concurrent sentences just of this sort. *See* USSG 2J1.6 cmt. 3. Because a concurrent is unavailable here, the Court should consider that the guideline range produces an unusual and particularly punitive result when crafting a sentence in this case. *Cf. Dean v. United States*, 137 S. Ct. 1170, 1176–78 (2017) (holding that a court may vary below the guidelines in consideration of a mandatory consecutive sentence on a separate count).

### V.     The Court Should Sentence Mr. Piccirilli to 30 Months' Incarceration

As the Court well knows, the Court must sentence Mr. Piccirilli to the term of incarceration that is "sufficient, but not greater than necessary" to meet the goals of sentencing under 18 U.S.C. § 3553(a). The Court should sentence Mr. Piccirilli to 30 months' incarceration, granting him a 7-month variance under the guideline range as calculated in the PSR.

A 30-month term of incarceration in this case will change Mr. Piccirilli's life. Having never before even been arrested, Mr. Piccirilli will serve a total between the two cases of 60 months' incarceration in a federal prison. Mr. Piccirilli has already served one year in custody that was at

---

[4] Problems with venue prevented the government from bringing a § 922(g) count in the District of Maryland.

times a living nightmare due to the pandemic. A 30-month sentence will keep him incarcerated (likely still during harsh conditions) into his mid-forties, when his young children are in their mid to late teens. Especially given its mandatorily consecutive nature, this is a sentence that speaks loud and clear to the seriousness of the offense and that fosters general deterrence and respect of the law in the public. *See* 18 U.S.C. § 3553(a)(2)(A), (B).

Yet, these are not the only goals of sentencing. The Court also must consider Mr. Piccirilli. Mr. Piccirilli has made two terrible mistakes. The latter mistake, the one before the Court, was made during a period of rock-bottom hopelessness and despair. And for the vast majority of his life Mr. Piccirilli has lived in a way that lifted up those around him. He has spent years making his community safer and happier. He is a joy to countless family members, friends, and supporters. In these ways, all signs point to Mr. Piccirilli starting where he left off when he is released.

The Court must balance these many complex truths in its sentence. 30 months is the term that strikes the correct balance between everything at work in this case. This sentence imposes a serious penalty that sends a message. But it neither buries Mr. Piccirilli nor ignores the significant good that he has done throughout the overwhelming majority of his life. In light of everything listed above, Mr. Piccirilli asks that the Court impose 30 months at his sentencing on November 19.

                Respectfully Submitted,

                James Wyda
                Federal Public Defender

                _____/s/_____
                Nate Smith (# 813194)
                Assistant Federal Public Defender
                6411 Ivy Ln.
                Suite 710
                Greenbelt, Maryland 20770
                Phone: (301) 344-0600;

Fax: (301) 344-0019  
Email: [Nate_Smith@fd.org](mailto:Nate_Smith@fd.org)